In the

# United States Court of Appeals
## For the Seventh Circuit

---

No. 06-4144

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

PETER G. ROGAN,

*Defendant-Appellant.*

---

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 02 C 3310—**John W. Darrah**, *Judge.*

---

ARGUED SEPTEMBER 21, 2007—DECIDED FEBRUARY 20, 2008

---

Before EASTERBROOK, *Chief Judge*, and KANNE and
ROVNER, *Circuit Judges.*

EASTERBROOK, *Chief Judge.* For more than a decade be-
fore Edgewater Medical Center closed in December 2001,
Peter Rogan was a principal manager and financial
beneficiary—both directly and through his family's interest
in Braddock L.P., Edgewater's management company.
Toward the end of Edgewater's existence, Braddock
(renamed Bainbridge Management, L.P.), Roger Ehmen
(Edgewater's vice president of development and market-
ing), and four physicians (Ravi Barnabas, Andrew Cubria,
Sheshiqiri Rao, and Kumar Kaliana) were indicted for
fraud and other crimes related to bills that Edgewater
had presented to the Medicare and Medicaid programs.

All six defendants pleaded guilty. Bainbridge was fined and ordered to pay restitution; the other defendants received sentences ranging from 52 to 151 months' imprisonment.

Rogan was not indicted. Instead the United States filed this civil action against him under the False Claims Act, 31 U.S.C. §§ 3729–33. The theory of the case is that Rogan conspired with the six indicted persons to defraud the United States by concealing the fact that many patients came to Edgewater only because of referrals that violated the Stark Amendment to the Medicare Act, 42 U.S.C. §1395nn, and the Anti-Kickback Act, 42 U.S.C. §1320a–7b. Edgewater paid the four physicians for patients rather than medical services. The complaint added that, apart from the fact that the Stark Amendment forbids federal reimbursement for services that stem from compensated referrals, many of the bills were padded: they listed services that were unnecessary or had not been performed. The district court held a bench trial, found that Rogan knew about these shenanigans (and may have orchestrated them), and ordered him to pay a total of $64 million and change. 459 F. Supp. 2d 692 (N.D. Ill. 2006). The district court's comprehensive opinion describes the scheme's details.

In this court Rogan does not deny that illegal referrals occurred, that kickbacks were paid, that the bills sent to the United States omitted this information, and that he knew what was going on. Instead he argues that the omissions were not material. By this he does not mean the usual definition, under which a "statement is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" *Neder v. United States*, 527 U.S. 1, 16 (1999) (quoting from *Kungys v. United States*, 485 U.S. 759, 770 (1988)). The omissions were material by that standard, because the Stark Amendment

forbids payment of any claim that arises from medical services rendered to a patient who had been referred improperly. See *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997). Rogan agrees that this is so but argues, nonetheless, that a federal employee in a position to take a decision had to testify that the government was sure to enforce the statute.

That's not a component of materiality. A statement or omission is "capable of influencing" a decision even if those who make the decision are negligent and fail to appreciate the statement's significance. Suppose someone who applies for a loan represents that he has a net worth of $2 million, when his actual net worth is -$2 million. A loan officer might fail to see the minus sign (had one been included), but the lie would be material anyway, because net worth strongly influences lending decisions. So, too, information that a hospital has purchased patients by paying kickbacks has a good probability of affecting the decision. The question is not remotely whether Edgewater was sure to be caught—though it would have been, had it disclosed the truth on all 1,812 reimbursement requests—but whether the omission could have influenced the agency's decision. That's an objective standard, here controlled by the Stark Amendment. Testimony from a claims-processing officer along the lines of "I follow the law" is not required.

Another way to see this is to recognize that laws against fraud protect the gullible and the careless—perhaps *especially* the gullible and the careless—and could not serve that function if proof of materiality depended on establishing that the recipient of the statement would have protected his own interests. See *United States v. Rosby*, 454 F.3d 670 (7th Cir. 2006). The United States is entitled to guard the public fisc against schemes designed to take advantage of overworked, harried, or

inattentive disbursing officers; the False Claims Act does this by insisting that persons who send bills to the Treasury tell the truth. As Justice Holmes put it, "[m]en must turn square corners when they deal with the Government." *Rock Island, Arkansas & Louisiana R.R. v. United States*, 254 U.S. 141, 143 (1920).

Rogan asserts that the United States did not rely on the omissions. Reliance is an element of a civil action under the False Claims Act but is easy to show: the truth would have revealed that reimbursement is illegal. Rogan's assertion that some disbursing officer had to testify that the United States does not pay illegal claims is just a repackaged version of the materiality argument and fails for reasons already given.

Nor does Rogan get any mileage from the argument that Edgewater's records do not "rule out" the possibility that the four physicians provided some medical services. Ruling things out is not the standard in a civil suit (or even in a criminal prosecution). The district judge gave careful attention to the codes on the records and concluded that the physicians used codes to identify referred patients. Rogan could hardly expect the admitting form to read "patient acquired by kickback" as opposed to some seemingly innocuous notation that those in the know (such as Ehmen) would take as the cue to pay the agreed price to the referring physician. That the codes included words such as "attending," which could mean that the physician rendered medical services, does not compel the district judge to find that services *were* rendered. Rogan does not try to show that any of the detailed factual findings on this score is clearly erroneous. (His argument that the district judge had to address each of the 1,812 claim forms is a formula for paralysis. Statistical analysis should suffice. At all events, Rogan didn't bother to provide information on that subject in the district court and has forfeited this position.)

We pass some other arguments in silence (they have been considered but are insubstantial) and reach the question whether the monetary award is excessive. To a considerable extent, the challenge to the $64 million award repeats contentions already addressed; we need not recover that ground. Nor do we think it important that most of the patients for which claims were submitted received some medical care—perhaps all the care reflected in the claim forms. (At Rogan's insistence, the district judge excluded as irrelevant any proof that Edgewater billed for unnecessary or non-delivered services.) Edgewater did not furnish any medical service to the United States. The government offers a subsidy (from the patients' perspective, a form of insurance), with conditions. When the conditions are not satisfied, nothing is due. Thus the entire amount that Edgewater received on these 1,812 claims must be paid back. Now it may be that, if the patients had gone elsewhere, the United States would have paid for their care. Or perhaps the patients, or a private insurer, would have paid for care at Edgewater had it refrained from billing the United States. But neither possibility allows Rogan to keep money obtained from the Treasury by false pretenses, or avoid the penalty for deceit.

The False Claims Act provides for treble damages plus a per-claim penalty. See 31 U.S.C. §3729(a). Edgewater received approximately $17 million on its false claims; this was trebled, the penalty added, and the amount of restitution paid by Braddock subtracted, to produce the judgment of $64 million. Rogan contends that $64 million violates the Excessive Fines Clause of the Eighth Amendment because it is grossly disproportionate to the wrong.

It is far from clear that the Excessive Fines Clause applies to civil actions under the False Claims Act. *Browning-Ferris Industries of Vermont, Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257 (1989), holds that punitive

damages are not "fines" under the Eighth Amendment, and treble damages are often grouped with punitive damages. We know from *Hudson v. United States*, 522 U.S. 93 (1997), overruling *United States v. Halper*, 490 U.S. 435 (1989), that penalties under the False Claims Act are not criminal punishment for the purpose of the Double Jeopardy Clause in the Fifth Amendment. Perhaps this means that the Excessive Fines Clause also is inapplicable, though *Browning-Ferris* does qualify its holding by saying that penalties paid to the sovereign can be "fines" under the Eighth Amendment. 492 U.S. at 265. The False Claims Act has a penal component, no doubt, see *Cook County v. United States ex rel. Chandler*, 538 U.S. 119, 130 (2003), but "penal" does not mean "excessive," for "judgments about the appropriate punishment for an offense belong in the first instance to the legislature." *United States v. Bajakajian*, 524 U.S. 321, 336 (1998).

All of this leaves the law unsettled. Matters need not be sorted out today, for several reasons (in addition to the norm that constitutional decisions must be avoided when possible). First, Rogan did not make an excessive-fines argument in the district court, and there is no general doctrine of plain-error review in civil cases. (The exception for jury instructions, see Fed. R. Civ. P. 51(d), does not cover Rogan's situation.) Second, it is impossible to know whether the penalty is constitutionally "excessive" without knowing what conduct the fine penalizes. Rogan persuaded the district court to exclude evidence that medical services were unnecessary, or never performed, because (Rogan insisted) this would not matter to the penalty under the False Claims Act. But this certainly *would* matter to an excessive-fines analysis. Rogan himself has made the record unsuitable to resolution of his constitutional argument.

Finally, the total is less than four times actual damages, well within the single-digit level that *State Farm Mutual*

*Automobile Insurance Co. v. Campbell*, 538 U.S. 408 (2003), thinks not "grossly excessive" for punitive damages. It's hard to see why the Court's approach to punitive damages under the Fifth Amendment would differ dramatically from analysis under the Excessive Fines Clause. (If there is to be a difference, one would think that a fine expressly authorized by statute could be higher than a penalty selected *ad hoc* by a jury.)

Neither the record nor any data to which the parties have drawn our attention shows the likelihood that schemes such as Rogan's will be caught. The lower the rate of a fraud's detection, the higher the multiplier required to ensure that crime does not pay. See A. Mitchell Polinsky & Steven Shavell, *Punitive Damages: An Economic Analysis*, 111 Harv. L. Rev. 869 (1988). Without this information a court cannot know what multiplier is appropriate for compensation and deterrence; for all we can tell, Rogan's penalty may be too low.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*